UNITED STATES of America

v.

**Sidney JONES, et al., Defendants.**

**No. SSS85 Cr. 1075–CSH.**

United States District Court,
S.D. New York.

Oct. 8, 1986.

John McQuigan, Atlanta, Ga., for defendant Roland.

Robert L. Herbst, New York City, for defendant Stephens.

## MEMORANDUM OPINION

HAIGHT, District Judge:

I write this memorandum to amplify certain rulings made in preparation for and during the trial of this case, which resulted in conviction by the jury of certain of the defendants [1] on certain of the charges contained in the third superseding indictment.

*The Scheme Alleged in the Indictment*

A description of the alleged scheme lying at the heart of the indictment is necessary to an understanding of what follows.[2]

The scheme alleged is a confidence game, known in the present vernacular of the street as the "pigeon drop" game. It is of ancient lineage. John Bacany, an NYPD frauds squad detective of over 20 years' experience, testified during pre-trial proceedings that the game was a familiar one when he joined the force, and had existed for many years before that. The frauds squad distributes a pamphlet intended to warn the populace of the game. A prototype of the game was described in a novel, "Trick Baby," found in the possession of defendant Blackmon. I think it likely that some version of the pigeon drop game was played on the streets of ancient Babylon, Sodom, and Gomorrah.

As played in the case at bar, which covered the period April through November 1985, the game victimized elderly women (or "lames," in modern parlance). The game begins when one of the players con-

Rudolph L. Giuliani, U.S. Atty., S.D.N.Y., New York City, for the U.S.; Baruch Weiss, Asst. U.S. Atty., of counsel.

Barry Krinsky, Brooklyn, N.Y., for defendant Jones.

Douglas F. Eaton, New York City, for defendant Blackmon.

1. The third superseding indictment, on which the case went to trial, named six defendants: Sidney Jones, Derek Blackmon, Larry Ogletree, Tyrone Stephens, Cynthia Grace Roland, and Grace Rembert. The charges against Ogletree were dismissed in accordance with an agreement of counsel negotiated during trial. Rembert was and remains a fugitive. The jury was left to consider, and convicted, Jones, Blackmon, Stephens, and Roland.

2. The original indictment charged only Jones and Blackmon with complicity in the scheme described in the text. As the joint FBI/NYPD investigation proceeded, unearthing additional victims and additional perpetrators, the Government obtained from the grand jury a series of superseding indictments, with their boundaries expanded accordingly. However, as stated in text, the Government never deviated from its contention that all defendants were participants in a single scheme.

vinces the victim that they have, fortuitously and together, found on the street a portfolio (or "pack") containing cash and securities of great value. The victim, let us say, is walking past St. Bartholomew's Church on the way to do volunteer work at the Lighthouse for the Blind. (These details are not invented for dramatic effect; they are derived from the evidence.) She is suddenly accosted by one of the con game players, who asks the victim if she dropped a leather portfolio seen lying on the street. The victim says "no." The player suggests that they open the portfolio, and does so. The victim gets a peek at what looks like bundles of cash in high denominations and negotiable securities. There is also a note making some sort of reference to the "P.L.O." or to "Iran." The player must set the hook by sustaining the prospective victim's interest, and generally exciting her desire for personal gain. If she disclaims any interest, or simply says "turn the portfolio over to the police" and departs, the game is lost and a new victim must be found. The first stage of the game is accomplished if, by fast and glib patter, the player persuades the victim that the player works for a distinguished banker or business executive, whose advice should be obtained about what to do with the "found" portfolio and its contents.

This brings the victim into telephone contact with the key con game player, the "talker." The victim never meets the talker, although she expects to, and may fruitlessly try to. Something always comes up to prevent a meeting *en face*. But what the talker says on the telephone to the victim is that he is an executive with a leading bank, or a business executive; that the cash and securities in the portfolio were destined for the P.L.O. terrorists or for Iran, in violation of humanitarian principles or legal embargo, as the case may be; that in the circumstances the owner of the valuables will never claim them, so that they may be regarded as found money; and that the total value is beyond the dreams of avarice (usually stated in the millions). The talker proposes a three-way split (victim, street player, and himself),

and assures the victim that he will attend to any tax complications, in consultation with a high I.R.S. official of his acquaintance.

In the case at bar, the "talkers" pretending to be bankers or executives used the names "Mr. Goldberg" or "Mr. Goldstein." The equally fictitious I.R.S. official was "Mr. Carmichael."

If the victim remains on the hook, she is next persuaded to take out a bank safe deposit box, and then rent two adjoining rooms in a motel. In one of those rooms she meets with the street player, who produces large quantities of cash (apparently quite genuine) which is "counted down" to the victim, placed in felt money bags, and then purportedly lodged, with the "assistance" of the street player, in the victim's safe deposit box.

The amount of cash counted down to the victim always corresponded to the amount the victim had in her own independent bank or securities accounts: information the con game players obtained from the victim early on. It is those assets, of course, which were the objectives of the game. The function of the cash count down, said to represent an initial distribution of the victim's share of the "found" valuables, was to make the victim feel secure about entering into the final stage of the game. That sense of security was false. The "counted down" cash (which represented, in effect, the con game players' working capital) was always switched out of the bank bags, and cut-up paper substituted for it. The victims had been instructed by "Mr. Goldberg" or "Mr. Goldstein" not to spend any of the money supposedly in the safe deposit box for several months.

All this is preamble. The game succeeds when the victim is then persuaded to take money or securities out of her own account, convert them into foreign currency, and give the foreign currency to the street player (purportedly Mr. Goldberg's employee) for delivery to Mr. Goldberg. The pretexts given to the victims for this transfer of her assets varied. Typically "Mr.

Goldberg" told the victim that, as an experienced banker or international businessman, he could produce a much higher rate of return on the victim's investments.

Writing in the calm of chambers, it seems amazing that such a scheme ever succeeded. But it did, repeatedly. One victim at trial, the widow of a corporate lawyer, closed out a Merrill Lynch securities account in excess of $500,000, placed the proceeds in banks, then withdrew the funds, converted them into foreign currency and gave the entire amount to defendant Roland (the street player who pretended to be a nurse, "Mary Anderson," in the employ of "Mr. Goldberg"), for transmittal to Mr. Goldberg. The victim did all this on the telephoned instructions of a stranger she never met. While this was the largest amount testified to by a victim at trial, the pigeon drop game was played in the same way with all the victims described in the evidence.

### Federal Prosecution

Clearly, this ancient scam constitutes grand larceny under New York law. Defense counsel stated repeatedly that practitioners of the pigeon drop game are invariably prosecuted in the state courts. There seems no reason to doubt that this is so. None of the extensive research of Court or counsel on the "federal question" aspects of the indictment revealed prior federal prosecution of such a scheme. However, the case at bar, which began as a joint FBI/NYPD investigation (one of the victims had complained to the FBI), eventually took the form of an elaborate and complex federal indictment.

I do not criticize the choice of federal over state prosecution. It is no more my position to do so than that of defense counsel. The United States Attorney's Office has discretion, at least initially, to determine if a crime is federal in nature, and to prosecute it accordingly. But the form the third superseding indictment took raised questions which permeate the record, some of which are further dealt with in this memorandum.

### Form of the Indictment

The indictment on which the case was sent to trial charged defendants with conspiring to violate, or with substantive violations of, what would appear to be every federal statute of even arguable relevance to this scheme.

Count 1 charged all defendants with violating 18 U.S.C. § 371 by entering into a single conspiracy to commit the following federal crimes:

(a) Possession of counterfeit or forged securities of an organization, in violation of 18 U.S.C. § 511(a).

(b) Wire fraud, in violation of 18 U.S.C. § 1343.

(c) Possession of five or more identification documents, in violation of 18 U.S.C. § 1028(a)(3).

(d) Possession of fifteen or more access devices, in violation of 18 U.S.C. § 1029(a)(3).

(e) Securities fraud, in violation of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

As to those of its aspects charging one or another of the fraudulent schemes, the indictment referred to six defrauded victims, and to three attempted victims as to whom, for one reason or another, the game did not work.

Substantive counts 2 through 5 charged all defendants with entering into a single scheme to commit wire fraud, in violation of § 1343. The four counts in furtherance of the alleged scheme each alleged a particular instance of interstate wire communication.

Counts 6 through 20 charged all defendants with entering into a single scheme to commit bank fraud, in violation of 18 U.S.C. § 1344. The 15 counts in furtherance of the alleged scheme each alleged a particular, fraudulently procured withdrawal by a victim of her funds from a federally insured bank. For some undisclosed reason, this particular scheme was not includ-

ed as an objective of the single § 371 conspiracy alleged in Count 1.

Counts 21 through 29 charged all defendants with securities fraud. Each of the nine counts charged two or more defendants with defrauding a particular victim, or attempting to do so.

Count 30 charged all defendants with possession of counterfeit or forged securities, in violation of § 511(a).

Count 31 charged Jones and Blackmon only with possession of unauthorized access devices, in violation of § 1029(a)(3).

Count 32 charged Jones and Blackmon only with possession of identification documents, in violation of § 1028(a)(3).

Count 33 charged Blackmon only with making a false statement in his application for appointment of counsel under the Criminal Justice Act, in violation of 18 U.S.C. § 1001.

Count 34 charged Jones only with violation of this Court's bail order restricting his travel, in violation of 18 U.S.C. § 401.

Count 35 charged Jones and Blackmon only with possession of cocaine. This charge resulted from a search under warrant of a Bronx apartment Jones and Blackmon used. I granted defendants' pretrial motion to sever this count.

*Rule 29 Rulings*

Defendants' counsel contended from the outset that all the Government's proof would and could show was a series of individual, unrelated con games, albeit with some occasional overlapping of players. They challenged the existence of the single conspiracy and single schemes alleged in the indictment.

In the event of conviction on such a prosecutorial theory, the questions for the appellate courts are whether the evidence permitted a reasonable jury, properly instructed, to find the existence of the single conspiracy or scheme alleged in the indictment; and, as to a particular defendant, his or her participation in it.[3] The appellate inquiry is retrospective, the defendant by definition having been convicted. In the trial court, these questions arise prospectively, at the end of the Government's case and within the context of Rule 29, F.R. Crim.P.

In the case at bar, when defendants made their Rule 29 motions the Government conceded that there was no evidence linking all defendants in a single conspiracy to violate 18 U.S.C. § 1028(a)(3) (possession of identification documents), or § 1029(a)(3) (possession of access devices). The only evidence of these illicit activities related to Jones and Blackmon. Accordingly these objectives of the single conspiracy alleged in Count 1 were stricken from that count, although they remained as substantive charges against Jones and Blackmon.

As to violations of 18 U.S.C. § 511(a) (possession of counterfeit or forged securities) and 15 U.S.C. § 78j(b) (securities fraud), I concluded that in the circumstances revealed by the evidence they were not legally viable objectives of any conspiracy or scheme alleged in the indictment. Accordingly these two objectives were stricken from the conspiracy count, and counts 21 through 29 (the substantive securities fraud counts) were dismissed. As to the conspiracy count, this left wire fraud as the sole surviving objective for the jury to consider.

I also held that, contrary to defendants' assertions, the allegation of a scheme to violate 18 U.S.C. § 1344 (bank fraud) was legally viable.[4]

---

**3.** See, *e.g., United States v. Alessi,* 638 F.2d 466, 472–73 (2d Cir.1980) (conspiracy). The same concepts apply to cases where the evidence might admit of single or separate schemes. *United States v. Camiel,* 689 F.2d 31, 35 (3d Cir.1982); *United States v. Rodgers,* 624 F.2d 1303, 1307 (5th Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

**4.** Defendants made no such contention with respect to the applicability of the wire fraud statute to the Government's theory of the case. However, I did dismiss Count 2 because of an absence of proof from which the jury could find that the telephone call underlying the count was in fact interstate.

I also held that a reasonable jury, properly instructed, would be entitled to find the existence of a single conspiracy to commit wire fraud, as well as single schemes to commit wire and bank fraud; and that each defendant was a participant in such conspiracy and schemes. The case was submitted to the jury accordingly, under instructions which dealt *inter alia.* with single versus multiple conspiracies and schemes.

My reasons for these rulings are, to some extent, stated on the record. That statement is sufficient in respect of the alleged violations of § 511(a). I write further on the issues of bank fraud and securities fraud.

*Bank Fraud*

The bank fraud statute is new. Congress added it to Title 18's anti-fraud arsenal by Pub.L. 98–473, Title II, § 1108(a), Oct. 12, 1984, 98 Stat. 2147. At least insofar as the research of Court and counsel reveal, the statute has not yet been judicially construed.

The statute reads in pertinent part:

"(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"(1) to defraud a federally chartered or insured financial institution; or

"(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

"(b) As used in this section, the term 'federally chartered or insured financial institution' means—

"(1) a bank with deposits insured by the Federal Deposit Insurance Corporation; ..."

■ The statute applies on its face to the scheme revealed by the evidence. That the scheme was fraudulent need not be further explicated. The victims were all deprived of moneys that had been placed "under the custody or control," § 1344(a)(2), of banks whose deposits were insured by the FDIC, § 1344(b)(1). Some victims had maintained these accounts before meeting the con artists. Others were induced by the con men to open accounts in New York banks in order to facilitate the flow of the victims' funds from their brokerage accounts into the con artists' hands. Thus as to each victim, defendants obtained by their fraudulent scheme "moneys ... under the custody or control" of a federally insured bank.

Defense counsel argued from the legislative history that § 1344 was intended only to apply where *banks* (as opposed to their depositors) are victimized by fraud. The legislative history certainly reveals protection of banks as a principal objective of the statute. Thus H.Rep. 98–901, 98th Cong. 2d Sess., at 2–3, describes the perceived problem in these terms:

"Federal banks and financial institutions are protected against theft and false statements; this protection, however, is incomplete. It does not extend to fraudulent schemes where banks are victims unless the specific elements of false statement or theft crimes are met. Schemes involving the writing of checks with insufficient funds ('check kiting') cannot be prosecuted as false statements, for example, because the Supreme Court has decided that a check does not constitute a statement that funds are available, but merely a promise to pay. Insider trading is not prosecutable if there is no resulting loss to the institution.

"Many frauds cannot be prosecuted under the bank larceny provision, since it does not apply where 'there is not a taking and carrying away of the property.' Wire and mail fraud statutes would reach such frauds, but only if the use of the mail or wire communication plays a significant part in the scheme. For example, case law provides that the use of the mails in the collection procedures for credit cards is insufficient, since such procedures are not essential to the fraud, but merely distribute the losses. This

shortcoming is of increasing significance as financial institutions more frequently use private courier services." (footnotes omitted).

In consequence, the report continues, the statute "enacts a new section to address schemes to defraud financial institutions, 18 U.S.C. § 1344." *Id.* at 4.

Notwithstanding that stated purpose, the statute as enacted seems to me to have plain and unambiguous meanings which squarely reach defendants' conduct. Defendants seek to restrict § 1344 despite its plain terms, but "[t]he short answer is that Congress did not write the statute that way." *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), citing and quoting *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979). That language adopted by *Russello* is quoted in turn in *Garcia v. United States,* 469 U.S. 70, 105 S.Ct. 479, 485, 80 L.Ed.2d 472 (1984), and is dispositive of the present issue. As *Garcia* reminds us at 105 S.Ct. 482, "[c]anons of construction indicate that terms connected in the disjunctive ... be given separate meanings." That is pertinent to the statute at bar because § 1344(a)(1), which makes it a crime "to defraud a federally chartered or "insured financial institution," is separated by the disjunctive "or" from subsection (a)(2), which covers the obtaining by fraud of "moneys ... owned by *or* [the disjunctive again] under the custody or control" of a federally insured bank. I accept defendants' statement that no bank was victimized; but to construe the statute as applying only when a bank is victimized would distort the plain meaning of the statute by disregarding some of its provisions. If Congress was concerned only with protecting banks, it could have stopped with § 1344(a)(1).

Appeals to legislative history are not favored if they run counter to a statute's plain meaning. "When we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" *Garcia, supra,* at 483, citing and quoting *TVA v. Hall,* 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978), which in turn quoted *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930). See also *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981): "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive,'" citing and quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

On occasion a defendant will argue that such a contrary intent appears because a broad construction of the criminal statute in question would, in the general context, produce an "absurd result." *Garcia,* 105 S.Ct. at 482. But there are no "rare and exceptional circumstances" in this case requiring or justifying disregard of this statute's plain and unambiguous language on the basis of its legislative history.[5] Nor is there any tension or inconsistency between protecting both banks and their depositors from fraudulent schemes; nor, finally, may this salutary effort be dismissed as "absurd."

*Securities Fraud*

I reached a different conclusion in respect of the securities fraud charges because extending the 1934 Act and Rule 10b–5 to this ancient scam would truly be absurd. Nor does the statutory language plainly require such an application: on the contrary.

No actual securities existed in this case. No genuine transactions in securities oc-

---

5. In addition to the House committee report quoted *supra,* defendants' counsel also relied upon comments by Congressman Conyers during a subcommittee hearing on the legislation. *Garcia* holds that "the authoritative source for finding the Legislature's intent lies in the committee reports on the bill"; the Court has "eschewed reliance on the passing comments of one member," or "casual statements from floor debates." 105 S.Ct. at 483 (citing cases).

curred or were contemplated. References to securities simply formed a part of the talker's patter. "Mr. Goldberg" would tell the victims that if they entrusted their money to him, he would do a much better job than, say, Merrill Lynch (where one of the victims had $500,000 under management). According to the evidence, sometimes Mr. Goldberg would vaguely promise market profits; to others he would promise profits through investing in his own offshore (and wholly fictitious) corporations.

The purportedly applicable provisions are found in section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Section 10(b) prohibits manipulative or deceptive devices "in connection with the purchase or sale of any security," a connective link echoed by Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240. 10b–5.

The Government was asked for authority extending this criminal statute to con games where the con artists separate money from their victims by promises of profit in nonexistent securities. The one case the Government found was *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill. 1967), a civil suit by a customer against a brokerage and the registered representative who handled plaintiffs' account. One of the latter's transgressions was to " 'sell' to plaintiffs securities which were in fact non-existent." 265 F.Supp. at 444. The district judge held that the complaint stated a cause of action under § 10(b) even as to non-existent securities, reasoning that fraud in respect of fictitious securities "is more odious" than misrepresentations concerning existing stocks "because the customer loses his entire investment." *Id.* at 445. The court, rejecting defendants' reliance on *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.1952), implied standing on the part of plaintiffs to bring a private § 10(b) action. *Goodman*, a decision of the Northern District of Illinois antedating *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), is now regarded by the Northern District of Illinois as super-

seded by *Blue Chip Stamps. Smith v. Chicago Corp.*, 566 F.Supp. 66, 68–69 (N.D. Ill.1983).

But this analysis need not be further pursued because we deal here with a criminal prosecution under the statute and rule, not a civil remedy implied by the courts. There is a significant procedural distinction, which the Second Circuit articulated in *United States v. Newman*, 664 F.2d 12, 17 (2d Cir.1981), *conviction affirmed after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983):

> "When litigation under this Rule is instituted by the SEC under section 21 or by a United States Attorney under section 32, the court's concern must be with the scope of the Rule, not plaintiff's standing to sue."

In criminal prosecutions, the issue of private implied causes of action does not arise, and cases dealing with that issue, such as *Goodman, supra,* are "inapplicable." *United States v. Naftalin*, 441 U.S. 768, 774 n. 6, 99 S.Ct. 2077, 2082 n. 6, 60 L.Ed.2d 624 (1979).

■ On the controlling issue of scope, or coverage, I hold that the actions of these defendants are not covered by a criminal statute proscribing fraud "in connection with the purchase or sale of any security." No actual purchase or sale of a security occurred in the implementation of this essentially common law fraud; nor could it have done so. I am unaware of any case giving the federal criminal securities statutes so expansive a reading. The Government cites none.

The appellate cases are uniform in requiring the presence of an actual purchase or sale, immediate or inherent in the nature of the scheme, for criminal liability to attach. Even in the insider trading cases, where the securities laws have been given their broadest recent application,[6] that requirement is stated. In *Newman* the Second Circuit explained why the 1934 Act covered the fraud of a faithless investment

---

**6.** See concurring opinion of Judge Dumbauld in

*Newman, supra,* at 20–21.

banker who leaked confidential information to "tippees":

"Appellee is left, then, with the argument that his fraud had no connection with the purchase or sale of securities. However, since appellee's sole purpose in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies, we find little merit in his disavowal of a connection between the fraud and the purchase."

The same theme was stated when the Second Circuit extended § 10(b) of the 1934 Act and accompanying Rule to the leaking Wall Street Journal columnist in *United States v. Carpenter*, 791 F.2d 1024 (1986). His conduct formed part of "a scheme to purchase and sell securities to be analyzed or otherwise discussed in future columns of that newspapers," *id.* at 1026; such purchases and sales subsequently took place in the market. Judge Pierce summarized the purpose of the securities laws at 1027:

"The fairness and integrity of conduct within the securities markets is a concern of utmost significance for the proper functioning of our securities laws."

In *United States v. Naftalin, supra,* the Securities Act of 1933, which prohibits fraud "in the offer or sale of any securities," was held to cover defendant's fraudulent short selling which victimized the brokers with whom he dealt. Defendant represented to the brokers that he owned the shares he purported to sell, although in fact he did not. Thus, in a sense, defendant was dealing in non-existent shares; but the criminal statute attached because the scheme triggered actual sales, as the Court observed at 441 U.S. 772, 99 S.Ct. at 2081:

"An offer and sale clearly occurred here. Respondent placed sell orders with the brokers; the brokers, acting as agents, executed the orders; and the results were contracts of sale which are within the statutory definition, 15 U.S.C. § 77b(3)."

The defendant in *Naftalin* argued unsuccessfully that the legislative history of the 1933 Act revealed a legislative intent to protect investors and not brokers. The Court disagreed, quoting the Senate Report ("The purpose of this bill is to protect the investing public and honest business."), and adding: "While investor protection was a constant preoccupation of the legislators, the record is also replete with references to the desire to protect ethical businessmen." 441 U.S. at 775–76, 99 S.Ct. at 2083. Comparable motives may be ascribed to the 1934 Act, but it hardly follows that Congress intended by that statute to bring "pigeon drop" con games within the ambit of federal securities regulations. *Cf. Herman & MacLean v. Huddleston,* 459 U.S. 375, 388–89, 103 S.Ct. 683, 690–91, 74 L.Ed.2d 548 (1983) ("... the antifraud provisions of the securities laws are not coextensive with common-law doctrines of fraud.").

The issue of coverage on this aspect of the case is whether the con artists, in their patter to these gullible victims, involved themselves in the securities markets "in a sufficiently meaningful way to subject themselves" to criminal liability under the 1934 Act and Rule. *United States v. Archer,* 486 F.2d 670, 680 (2d Cir.1973) (Friendly, Ct.J.) (construing applicability of Travel Act, 18 U.S.C. § 1952). Judge Friendly continued in *Archer:*

"In deciding that limited issue, we are free, indeed bound, to look to the legislative history, to consider the demands of federalism, and to heed the venerable rule, reaffirmed by the Supreme Court with respect to this very statute, that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' *Rewis v. United States, supra,* 401 U.S. [808] at 812, 91 S.Ct. [1056] at 1059 [28 L.Ed.2d 493 (1971) ]."

Under these criteria, the federal securities laws cannot reasonably form the basis of a criminal prosecution of these defendants. The language of statute and rule delineating their boundaries must be stretched to its limits to embrace these defendants. The most that can be said for the Government is that, in the present context, the ambit of this criminal statute is ambiguous;

but that very ambiguity brings into play the rule of lenity. The legislative history does not require a different result.

The coverage of the securities laws bears no resemblance to the bank fraud statute, discussed *supra*, where defendants' conduct was proscribed by the statute's plain and unambiguous language. In those circumstances the rule of lenity has no office to perform. *United States v. Turkette, supra*, 452 U.S. at 587 n. 10, 101 S.Ct. at 2531 n. 10 and cases cited.

*Supplemental Instruction to the Jury*

The Court charged the jury during the morning of Friday, July 25, 1986. The jury returned its verdicts during the afternoon of Wednesday, July 30.

During the course of deliberations, the foreman of the jury sent out a series of notes requesting exhibits and testimony. A point then came when the jury, in a note marked Court Exhibit 22, posed certain questions and asked for additional instructions. The jury's request, and the Court's ultimate response, prompted considerable colloquy between counsel and the Court. In view of the vigor with which counsel addressed the issues as they perceived them, I consider it appropriate to deal with the matter in greater detail than appears in the trial transcript.

■ Generally speaking, when a jury sends a request to the trial judge, the judge's duties are to (1) determine what the request is, and (2) decide upon the proper response. Counsel are of course entitled to be consulted on these issues. At times they are non-controversial. But frequently, the issues of what the jurors are asking and what should be said to them in reply give rise to fierce exchanges of advocacy. That is illustrated by the case at bar.

The jury's earlier requests made it appear that they were first dealing with the later charges in the indictment, dealing with Jones and/or Blackmon, and not addressing the central conspiracy and schemes alleged in the earlier counts. Subsequent requests for testimony and exhibits indicated that the jury had gone back to the beginning of the indictment, and was dealing with the conspiracy and the schemes. At 1:03 p.m. on July 30, the note emerged which is the subject of this discussion.

Before giving the details of what ensued, it will be useful to describe the manner in which the Court ruled on counsel's requests to charge, and thereafter charged the jury.

Counsel submitted written requests to charge in accordance with a previously determined schedule. The Court considered the requests and accompanying citations, conducted its own research, and prepared a draft of the intended charge which was distributed to counsel. That draft formed the essential subject matter of the charge conference between Court and counsel after the evidence was closed and just prior to summations. Certain changes were made to the draft as the result of the charge conference. The charge was then placed in final written form. I read the charge to the jury during the morning of July 25. Copies of the charge as read were given to the jurors to take into the jury room.[7]

In these circumstances, I received and showed to counsel the following note from the jury (Court Exhibit 22), reproduced in the transcript of the proceedings on July 30 at 3–4:

> " 'What is being referred to here is counts 3 to 20. If the premise of an overall scheme is accepted as true for element one and if one player has been found culpable in a particular scheme then must all of other players be found culpable even though they did not directly participate in the substantive counts being considered? This question is

7. Giving the jury a written copy of the entire charge rests in the discretion of the trial judge; it is particularly appropriate in complex cases where the charge is extensive. See, *e.g., United States v. Blane*, 375 F.2d 249, 255 (6th Cir.1967) and cases cited. See also *Haupt v. United States*, 330 U.S. 631, 643, 67 S.Ct. 874, 879, 91 L.Ed. 1145 (1947). The present defendants made no objection to the delivery of written copies of the charge to the jury.

meant to clarify whether membership in a scheme prior to or after a particular transaction necessarily indicates the guilt of a particular defendant if another participant in the scheme is directly culpable.

" 'Or somewhat differently, if a single scheme of a common nature existed and if one member of a group is implicated in regard to a particular count, then is it mandatory for the jury to declare the guilt of all the other defendants named or may discretion be applied so that only those who are determined to be directly involved in carrying out the scheme with a particular victim is guilty with respect to that victim? Does guilt for one necessarily imply guilt for all? For example, if defendant A is determined to be guilty with victim X then must defendants B, C, and D also be guilty if they are not involved with victim X but are members of the same scheme with defendant A at some point in time?

" 'We refer you to the last paragraph on page 50 and the first paragraph on page 51 which deals with the second element in the substantive counts.' "

The two paragraphs in the written charge to which the jury referred me read as follows:

"If you find that the Government has proved the existence of a single overall scheme, then it is not required that a defendant participated in or had knowledge of all of the operations of the scheme. The guilt of a defendant is not governed by the extent of his or her participation.

"It is also not necessary that the defendant participated in the alleged scheme from its inception. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and who intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter."

This language, taken from the Government's requests to charge, was derived from Judge Metzner's charge to the jury in *United States v. Amrep Corp.*, a mail fraud prosecution. The Court of Appeals confirmed the judgments of conviction. 560 F.2d 539 (2d Cir.1977). Likening a scheme to defraud to a conspiracy, the Second Circuit further stated at 545:

"So long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed."

It seemed to me then, and it seems to me now, that despite its relative prolixity, the jury was focusing upon the single proposition contained at pages 50–51 of the written charge. The jurors wished to be sure, before rendering their verdict, that a scheme member not directly connected with a particular fraudulent act was nevertheless responsible for it, if the other requisite elements had been proven. That is the precise proposition dealt with on the indicated pages of this Court's charge. That is the precise question answered in the affirmative by the Second Circuit in *Amrep*.[8]

---

8. Counsel for defendant Blackmon insists that in *Amrep* the Second Circuit "was talking only about the admissibility of evidence," and not the liability of one schemer for another's acts. Presentencing letter of Douglas F. Eaton, Esq., dated October 3, 1986, at 2. I cannot accept that narrow reading. Nor did Judge Johnson when he wrote for the Fifth Circuit in *United States v. Rodgers,* 624 F.2d 1303, 1308 (5th Cir.1980) that "co-schemers are jointly responsible for each other's acts in furtherance of the scheme." Judge Johnson cited *Amrep,* among other authorities, for that proposition.

Counsel's letter of October 3 expands upon the error he perceives in the Court's supplemental charge. "Prior to trial," Mr. Eaton writes, "I was confident that the jury would acquit Mr. Blackmon as to the first victim, Ms. Rosenfeld [Counts 6–8], and therefore as to Ms. Palumbo [Count 9], Ms. Putnam [Counts 10–14] and Ms. St. Lewis [Counts 15–16] even if a *Pinkerton* instruction were given." *Ibid.* (material in brackets supplied). Based upon counsel's confidence—one might characterize it as a fond hope—counsel characterizes the supplemental

Counsel for the defendants took an entirely different view of the jurors' note. They regarded the note as posing a whole series of questions, to which various answers should be made. A typical argument was made by Douglas Eaton, Esq., counsel for defendant Blackmon:

MR. EATON: Your Honor, the jury has asked five questions, and in the first question they have made a very significant error which should be corrected. They have talked about an overall scheme but then they have gone on to talk about a particular scheme, and I think it's important to point out first of all to the jury that the indictment charges particular counts, but the indictment does not charge particular schemes. Instead, counts 3 through 5 charge one overall scheme, and counts 6 through 20 charge one overall scheme.

We would ask your Honor to first correct that.

Then we ask you to give instruction—Mr. Herbst has written it out here—making clear to them that there is a first element and a second element, and then we would propose that the court answer the five questions.

Only the first question would have to be slightly rephrased. Instead of saying culpable in a particular scheme, I think it is fair to say culpable in a particular count as part of that overall scheme, and then I think the five questions should be answered.

The first question is, and slightly rephrased: If the premise of an overall scheme is accepted as true for element one, and if one player has been found culpable in a particular count as part of that overall scheme, then must all other players be found culpable even though they did not participate in the substantive count being considered?

The answer is no.

The second question is: Or somewhat differently, if a single scheme of a common nature existed and if one member of a group is implicated in regard to a particular count, then is it mandatory for the jury to declare the guilt of all theother defendants named?

The answer is no.

The third question: May discretion be applied so that only those who are determined to be directly involved in carrying out these schemes with a particular victim are guilty with respect that victim?

The answer is yes.

The fourth question: Does guilt for one necessarily imply guilt for all?

The answer is no.

The fifth question: For example, if defendant A is determined to be guilty with victim X, then must defendants B, C, and D also be guilty if they are not involved with victim X but are members of the same scheme with defendant A at some point in time?

---

charge as improperly telling "the jury that it was their 'duty' to convict a defendant retroactively as to women who were defrauded before he joined the scheme." *Ibid.*

There are two answers. In the first place, under settled law "retroactive" responsibility attaches to a co-conspirator or co-schemer who knowingly joins a conspiracy or scheme after it began. He ratifies what has gone before.

Secondly, counsel's pre-trial confidence that Blackmon would be acquitted on the Rosenfeld counts was misplaced. Ms. Rosenfeld was tricked in April 1985 by two men using the names "Samuel Wilson" and "Frank Roberts." She spent considerable time in the presence of both over two days. She could not make an in-court identification of Blackmon as "Roberts"; but on November 8, 1985 she picked Blackmon as "Roberts" out of a photo spread with "90 per cent" certainty. Tr. 256. I had rejected defendant's pre-trial motion to suppress this photo identification. Mr. Eaton cross-examined Ms. Rosenfeld on her photo identification, and argued to the jurors that they should disregard it; but clearly the jurors accepted Rosenfeld's photo identification of Blackmon, as they were entitled in law to do. With the identification of Blackmon as a participant with Jones (a central figure) in the earliest of the transactions alleged in the indictment, any spectre of "retroactive" responsibility on Blackmon's part vanishes. In point of fact, no individual defendant was charged in a substantive count until there was evidence available to the Government (and presented at trial) that he or she was on stage and playing a role in the scheme.

The answer is no.

Tr. 7–9.

Counsel for the Government opposed defendants' suggestions, and urged additional language of his own. (Tr. 13–15). These objections and arguments of counsel were made after I advised counsel preliminarily of my intended response. Tr. 4–6. After further consideration of counsel's submissions, I concluded that only the preliminary point made by Mr. Eaton was well founded. Accordingly, I recalled the jury and the following took place:

THE COURT: Members of the jury, you have sent me a note and I will read it into the record and then deal with it as best as I can. Your note reads:

What is being referred to here is counts 3 to 20.

"If the premise of an overall scheme is accepted as true for element one and if one player has been found culpable in a particular scheme, then must all other players be found culpable even though they did not directly participate in the substantive count being considered? This question is meant to clarify whether membership in a scheme prior to or after a particular transaction necessarily indicates the guilt of a particular defendant if another participant in the scheme is directly culpable.

"Or somewhat differently, if a single scheme of a common nature existed, and if one member of a group is implicated in regard to a particular count, then is it mandatory for the jury to declare the guilt of all the other defendants named or may discretion be applied so that only those who are determined to be directly involved in carrying out the scheme with a particular victim is guilty with respect to that victim? Does guilt for one necessarily imply guilt for all? For example, if defendant A is determined to be guilty with victim X then must defendants B, C, and D also be guilty if they are not involved with victim X but are members of the same scheme with defendant A at some point in time?

"We refer you to the last paragraph on page 50 and the first paragraphy on page 51 which deals with the second element in the substantive counts."

I want to say this to you preliminarily: In your note you say in the first paragraph, "if one player has been found culpable in a particular scheme."

Each alleged fraudulent transaction is more properly referred to as a particular count. The indictment charges partcular counts but the indictment does not charge particular schemes.

Please remember that the government charges in counts 3 through 5 a single scheme to commit wire fraud, and in counts 6 through 20 a single scheme to commit bank fraud.

If you have found the existence of a single overall scheme as charged, then you must decide who the members of that single overall scheme were. That is a decision you must make as to each defendant individually.

The language at pages 50 through 51 of my charge was intended to refer to a defendant who you have found to be a member of the single overall scheme. To make that clear, let me read that language to you again slightly edited from page 50.

If you find that the government has proved the existence of a single overall scheme, then it is not required that a defendant who is a member of that scheme participated in or had knowledge of all of the operations of the scheme. The guilt of a defendant who is a member is not governed by the extent of his or her participation.

It also is not necessary that such a defendant participated in the alleged scheme from its inception. A person who comes in at a later point with knowledge of the scheme's general operation although not necessarily of all of its details and intentionally acts in a way to further the unlawful goals becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the

criminal objective and all that is done thereafter. Even if a particular defendant who is a member of the scheme participated in the scheme to a lesser degree than his or her fellow schemers, he or she is nevertheless equally culpable so long as he or she became a member of the scheme to defraud with knowledge of its general scope and purpose.

And I add this particular instruction: So long as the transaction is within the general scope of the scheme on which all defendants had embarked a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed. It follows that as to all defendants who were members of a single scheme it is your duty to find them guilty of all substantive crimes committed in furtherance of that single scheme whether or not they were directly involved in a particular fraudulent transaction.

Those are my additional instructions.

Ladies and gentlemen, you may withdraw and continue your deliberations. Tr. 17–20.

Counsel for the defendants were permitted to argue the point further, but I eventually ended the colloquy by stating:

THE COURT: I fully appreciate the sincerity with which counsel address me at this stage in the trial.

I remain of the view that I have correctly answered the inquiries made by the jury and I have instructed them in accordance with the applicable law of this circuit. Tr. 26–27.

■■■ My perception of the jury's essential inquiry, and the authority underlying my response, have been discussed *supra*. I will only add that, in view of that controlling authority, it would have been quite wrong for me to say to the jury (as Mr. Eaton asked me to do) that the jury had discretion to convict only those defendants directly involved with a particular victim of the scheme. Of course, jurors have it within their power to acquit a defendant contrary to the evidence and the judge's in-

structions. Defense counsel may even be entitled to invite jurors to do so. But the trial judge can neither initiate nor join in the invitation. His duty is to instruct the jurors in their duty. Advising a jury that it has discretion to acquit a defendant in derogation of law would constitute a violation of the trial judge's duty.

## Brady Disclosures

This portion of the opinion deals with one aspect of defendants' requested disclosures under the principles articulated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) as further developed in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

As noted *supra*, the Government charged that the named defendants "and others known and unknown" (indictment, Count One ¶ 1) entered into a single conspiracy, and single schemes, to defraud their elderly victims.

During the pre-trial procedures, a dispute broke out as to the scheduling of the trial. The Government pressed for as prompt a trial as possible. It stressed the advanced age and frail health of a number of the victims who would appear as witnesses. Of course, the original trial dates had to be abandoned as the Government kept adding new defendants and superseding the indictment. Eventually, however, defendant Gloria Rembert, remaining a fugitive, was severed; and the five other defendants remained for trial. The issue as to time of trial came down to May or June (as the Government strenuously urged) or October (as all defense counsel preferred). I concluded that the Court both could and should bring the case on for trial in late May or early June, thereby giving recognition to the Government's legitimate concerns. However, in order to ensure a fair opportunity to defendants to prepare the case, the Government was placed under somewhat broader pre-trial discovery requirements that might otherwise have obtained. I need not describe all the pre-trial disclosures which the Govern-

ment was required to make. One of them, however, is central to the present subject.

In response to a Court directive, the Government advised defense counsel by letter that it intended to elicit expert opinion testimony from one of the NYPD detectives who investigated the case. That detective, a veteran member of the special fraud squad, was prepared to give his opinion that the distinctive *modus operandi* of the pigeon drop game revealed by the investigation showed that a particular group of people (the defendants) had entered into a single conspiracy or scheme. As previously observed, that concept of single conspiracy or scheme was disputed by defendants. The characteristics upon which this witness intended to base his expert opinion included repeated use of the names "Goldberg" and "Goldstein"; pressuring the victims to open up safe deposit boxes; the "counting down" to the victims of large amounts of cash; and the conversion of the victims' own funds into foreign currency, more particularly at a facility known as "Chequepoint U.S.A.," located on Madison Avenue in New York City. These perceived similarities of technique, which lay at the heart of the proffered expert testimony, came to be known in the colloquys of Court and counsel as the "fingerprint" theory.

Defense counsel responded to the Government's proposed expert testimony by seeking to subpoena the special fraud squad's investigative files relating to pigeon drop con games throughout the city for a significant period of time. The defense purpose was to explore whether these particular characteristics or implementations were so common that no inference of single conspiracy or single scheme could reasonably be drawn from them. Defendants sought ammunition for a motion *in limine* precluding the opinion testimony; or, failing that, for cross-examination of the expert.

The Government resisted turning over fraud squad investigative files to defense counsel. The Government argued that some investigations were ongoing, and could be compromised by making them known to members of the "con game fraternity"; that such disclosure could lead to harassment or intimidation of victims in other cases; and that identified victims of earlier pigeon drop schemes would then become vulnerable to a familiar follow-up procedure, whereby different con men, impersonating law enforcement officers, mulct even more money from previously defrauded victims. The Government took the view, in these circumstances, that no disclosure of NYPD files should be made to defense counsel until the Court had first examined them *in camera* for *Brady* material. That latter suggestion posed practical problems of some magnitude, since there were hundreds, perhaps thousands of such files.

Nevertheless, in view of the Government's proffered "fingerprint" expert opinion testimony, it seemed to me that the defendants' request for examination of these files was as reasonable as was the Government's concern about the manner in which that review should be accomplished. In these circumstances, I gave the Government this choice: either abandon the "fingerprint" theory, forego the expert opinion testimony, and accept an appropriate instruction from the Court to the jury taking the "fingerprint" theory out of the case, in which event the trial would commence in June; or adhering to the fingerprint theory and the expert testimony, in which event the fraud squad pigeon drop files would be submitted to the Court for *in camera* inspection, and the trial would be continued until October.

The Government selected the former option. Evidentiary hearings on unrelated motions to suppress evidence began on June 9, 1986. Jury selection began on June 16. The trial commenced on June 23.

The particular instruction which I gave to the jury on this point read as follows:

I instruct you that this is a very common sort of scheme. It has been practiced by many people in many cities for many years. There is no dispute between the Government and the defendants about

that. And indeed, you may recall the testimony of Constance Tryban [a coconspirator who pleaded guilty and testified for the Government] that, if you accept it, would permit you to find that upon her return to New York from Detroit in October 1985, following a falling out with Mr. Blackmon, she began playing this sort of con game with an individual named "Peter Brown," who the Government does not suggest was connected with the single conspiracy charged in the indictment.

In these circumstances, you may not base a finding of the single conspiracy claimed in the indictment, or an individual defendant's participation in a conspiracy, upon common methods such as the role of a "phone man" named "Goldberg" or "Goldstein," or the use of safety deposit boxes, similarly-colored money bags, cut-up paper, large amounts of cash counted out to a victim, the use of hotel rooms, or conversion of the victim's money into foreign currency at Chequepoint, U.S.A., as evidence of the single conspiracy alleged in the indictment. That is because this scheme and its methodology are too common to permit such an inference to be drawn.

Written charge at 28–29 (emphasis in brackets supplied).

Notwithstanding the elimination of the "fingerprint" theory of proof from the case, I continued in an exercise defense counsel had urged upon me: *in camera* examination of other NYPD files involving conversion of American into foreign currency at Chequepoint U.S.A.[9] There were eight of these.

■ To require disclosure under *Brady*, as further defined in *Agurs*, evidentiary material must be of "obviously exculpatory character" and "clearly supportive of a claim of innocence," 427 U.S. at 107, 96 S.Ct. at 2399. In the case at bar, the Government could not argue, and the jury was not permitted to consider, *modus operandi* as a basis for inferring the guilt of any defendant in respect of any fraudulent act alleged in the indictment. Accordingly the other Chequepoint files would constitute *Brady* material only if material in them tended to absolve a particular defendant of complicity in the particular fraudulent transactions alleged in the indictment and sought to be proved at trial.[10]

The eight files in question contained no such material.[11] I so advised counsel. The files remain under seal for appellate review.

**9.** By "other" files I mean files which did not relate to the victims alleged in the indictment. As to the contents of those files, full disclosure of pertinent facts was made as the result of a combination of pre-trial suppression hearings, *Brady* disclosures, and Jencks Act disclosures under 18 U.S.C. § 3500.

**10.** Examples of such exculpatory material may be found in *United States v. Olson*, 697 F.2d 273 (8th Cir.1983) (in prosecution for passing counterfeit money in Minnesota, Government improperly failed to disclose that it had in custody two Minnesota men arrested in Kansas City with identical counterfeit bills in their possession). *Cf. also Grant v. Alldredge*, 498 F.2d 376 (2d Cir.1974), where the indictment charged Grant with participating in a bank robbery. The teller was shown a photo array of fourteen individuals which included Grant and one Walsh. She "selected Walsh, not Grant, as the person most closely resembling the bank robber." 498 F.2d at 379. The Government told Grant's counsel only that the teller "was not able to pick a photograph of this defendant [Grant] from a spread of fourteen individuals, as the man who robbed the bank," *id.* at 380; it did not reveal the teller's identification of Walsh. Not surprisingly, the Second Circuit found this disclosure inadequate under *Brady*.

**11.** In seven of the files, victims could not identify one or another of the defendants. Even if the fingerprint theory had not been removed from the case, the inference to be drawn from a particular victim's inability to identify a defendant is "of a neutral nature" and does not constitute evidence "obviously exculpatory" or "clearly supportive of innocence." *United States v. Rhodes*, 569 F.2d 384, 388 (5th Cir.1978). *A fortiori* this is so in the case at bar, given the limitations on the prosecution. One victim, not referred to in the indictment or proof, identified a woman perpetrator in an incident which did not form part of the investigation resulting in the indictment. This is exculpatory of no present defendant, again given the limitation on the Government's evidence and the particular instruction to the jury.