**UNITED STATES of America, Appellee,**

v.

**Derek BLACKMON, Sidney Jones, Tyrone Stephens and Cecilia Grace Roland, Defendants–Appellants.**

Nos. 1182 to 1185, Dockets 86–1427, 86–1451 to 86–1453.

United States Court of Appeals, Second Circuit.

Argued May 27, 1987.

Decided Feb. 9, 1988.

Baruch Weiss, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Kenneth Roth, Asst. U.S. Atty., of counsel), for appellee.

Douglas F. Eaton, New York City, for defendant-appellant Derek Blackmon.

Barry Krinsky, New York City, for defendant-appellant Sidney Jones.

Donald E. Nawi, New Rochelle, N.Y., for defendant-appellant Tyrone Stephens.

David Seth Michaels, Spencertown, N.Y., for defendant-appellant Cecilia Grace Roland.

Before FEINBERG, Chief Judge, MINER and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This is an appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a jury trial before Judge Charles S. Haight, Jr. Derek Blackmon appeals from his convictions on one count

of conspiracy to commit wire fraud, 18 U.S.C. § 371 (1982), two counts of substantive wire fraud, 18 U.S.C. §§ 1343 and 2 (1982), fifteen counts of bank fraud, 18 U.S.C. §§ 1344 (Supp. IV 1986) and 2 (1982), one count of possession of fifteen or more unauthorized access devices with intent to defraud, 18 U.S.C. §§ 1029(a)(3) (Supp. IV 1986) and 2 (1982), one count of possession of five or more identification documents with intent to use them unlawfully, 18 U.S.C. §§ 1028 (a)(3) (1982 and Supp. IV 1986) and 2 (1982), and one count of making a false statement, 18 U.S.C. § 1001 (1982). Sidney Jones appeals from his convictions on one count of conspiracy to commit wire fraud, two counts of substantive wire fraud, fifteen counts of bank fraud, one count of possession of fifteen or more unauthorized access devices with intent to defraud, one count of possession of five or more identification documents with intent to use them unlawfully, and one count of contempt for violating conditions of bail, 18 U.S.C. § 401 (1982). Tyrone Stephens appeals from his convictions on one count of conspiracy to commit wire fraud, two counts of substantive wire fraud, and twelve counts of bank fraud. Cecilia Grace Roland appeals from her convictions on one count of conspiracy to commit wire fraud, two counts of substantive wire fraud, and eleven counts of bank fraud. In various combinations of concurrent and consecutive sentences, Blackmon and Jones were sentenced to ten years imprisonment and five years probation, Stephens was sentenced to seven years imprisonment and five years probation, and Roland was sentenced to eighteen months imprisonment and five years probation.

All defendants-appellants contend that (1) the bank fraud convictions must be reversed because the statute does not reach the conduct in which they engaged, (2) the jury was erroneously instructed concerning the vicarious and retroactive liability of coconspirators, (3) the trial judge erroneously failed to instruct the jury that the interstate nature of a wire communication by a third party must be foreseeable under the wire fraud statute, and (4) the trial judge improperly responded to a note from the jury without first consulting counsel. Stephens argues, inter alia, that the trial judge erroneously admitted hearsay statements made by a coconspirator. Blackmon and Jones contend, inter alia, that the trial judge erroneously refused to instruct the jury that the access device statute requires intent to defraud a credit card holder or a credit card company, and assert other errors pertinent to their remaining convictions.

We vacate the convictions of all defendants as to the two substantive wire fraud counts and the convictions of Blackmon and Jones as to the count alleging possession of fifteen or more access devices with intent to defraud, reverse the convictions of all defendants with respect to the fifteen bank fraud counts, affirm the remaining convictions, and remand for resentencing and any other proceedings that may ensue.

### Background

The indictment alleged an elaborate scheme by the appellants to defraud six victims in New York City during a period from March to November, 1985.[1] The scheme is a variation of a street confidence game known as the "pigeon drop." The colorful details of the game are described in a portion of the district court opinion, *United States v. Jones*, 648 F.Supp. 225, 226–28 (S.D.N.Y.1986), that is set forth in the margin.[2] Essentially, the game in-

---

1. In addition to the various substantive counts, including wire fraud and bank fraud, the indictment also charged a single conspiracy by all four defendants. The trial judge dismissed several objects of the conspiracy and submitted the conspiracy count to the jury with wire fraud as the only object of the single conspiracy. Use of interstate wire communications was involved with only one victim, Peggy St. Lewis.

2. In Judge Haight's words:

As played in the case at bar, which covered the period April through November 1985, the game victimized elderly women (or "lames," in modern parlance). The game begins when one of the players convinces the victim that they have, fortuitously and together, found on the street a portfolio (or "pack") containing cash and securities of great value. The victim, let us say, is walking past St. Bartholomew's Church on the way to do volunteer

volved persuading wealthy elderly women that they had "found" cash earmarked for Iran or the PLO, and then convincing the women to withdraw their *own* money from banks in an amount equivalent to their "share" of the found cash, convert that money into foreign currency, and give the foreign currency to the appellants for high-return foreign investment. The victims, of course, never saw either their share of the found money or their own money again. The six victims, who were defrauded of a total of $1,197,000, were: Gloria Rosenfeld, April, 1985; Josephine Palumbo, July, 1985; Simone Putnam, August, 1985; Peggy St. Lewis, September, 1985; Sylvia Roberts, September, 1985; and Hadassah Feit, October, 1985.

The jury found all appellants guilty on one count of conspiracy to commit wire fraud, and two counts of substantive wire fraud in connection with the fraud on Peggy St. Lewis, which involved two wire transfers of money by the victim from Florida to New York. The jury also found the appellants guilty on numerous counts each of bank fraud in connection with the

work at the Lighthouse for the Blind. (These details are not invented for dramatic effect; they are derived from the evidence.) She is suddenly accosted by one of the con game players, who asks the victim if she dropped a leather portfolio seen lying on the street. The victim says "no." The player suggests that they open the portfolio, and does so. The victim gets a peek at what looks like bundles of cash in high denominations and negotiable securities. There is also a note making some sort of reference to the "P.L.O." or to "Iran." The player must set the hook by sustaining the prospective victim's interest, and generally exciting her desire for personal gain. If she disclaims any interest, or simply says "turn the portfolio over to the police" and departs, the game is lost and a new victim must be found. The first stage of the game is accomplished if, by fast and glib patter, the player persuades the victim that the player works for a distinguished banker or business executive, whose advice should be obtained about what to do with the "found" portfolio and its contents.

This brings the victim into telephone contact with the key con game player, the "talker." The victim never meets the talker, although she expects to, and may fruitlessly try to. Something always comes up to prevent a meeting *en face*. But what the talker says on the telephone to the victim is that he is an executive with a leading bank, or a business executive; that the cash and securities in the portfolio were destined for the P.L.O. terrorists or for Iran, in violation of humanitarian principles or legal embargo, as the case may be; that in the circumstances the owner of the valuables will never claim them, so that they may be regarded as found money; and that the total value is beyond the dreams of avarice (usually stated in the millions). The talker proposes a three-way split (victim, street player, and himself), and assures the victim that he will attend to any tax complications, in consultation with a high I.R.S. official of his acquaintance.

In the case at bar, the "talkers" pretending to be bankers or executives used the names "Mr. Goldberg" or "Mr. Goldstein." The equally fictitious I.R.S. official was "Mr. Carmichael." If the victim remains on the hook, she is next persuaded to take out a bank safe deposit box, and then rent two adjoining rooms in a motel. In one of those rooms she meets with the street player, who produces large quantities of cash (apparently quite genuine) which is "counted down" to the victim, placed in felt money bags, and then purportedly lodged, with the "assistance" of the street player, in the victim's safe deposit box.

The amount of cash counted down to the victim always corresponded to the amount the victim had in her own independent bank or securities accounts: information the con game players obtained from the victim early on. It is those assets, of course, which were the objectives of the game. The function of the cash count down, said to represent an initial distribution of the victim's share of the "found" valuables, was to make the victim feel secure about entering into the final stage of the game. That sense of security was false. The "counted down" cash (which represented, in effect, the con game players' working capital) was always switched out of the bank bags, and cut-up paper substituted for it. The victims had been instructed by "Mr. Goldberg" or "Mr. Goldstein" not to spend any of the money supposedly in the safe deposit box for several months.

All this is preamble. The game succeeds when the victim is then persuaded to take money or securities out of her own account, convert them into foreign currency, and give the foreign currency to the street player (purportedly Mr. Goldberg's employee) for delivery to Mr. Goldberg. The pretexts given to the victims for this transfer of her assets varied. Typically, "Mr. Goldberg" told the victim that, as an experienced banker or international businessman, he could produce a much higher rate of return on the victim's investments.

648 F.Supp. at 226–28.

frauds on the six victims,[3] which involved the withdrawal of funds by the victims from federally insured banks.

The government also established that nineteen credit cards, two bank cards and nineteen governmental identification documents were found in Jones' apartment, in a suitcase belonging to Blackmon. On the basis of this evidence, both Blackmon and Jones were convicted of possession of fifteen or more unauthorized access cards with intent to defraud, and possession of five or more government identification documents with intent to use them unlawfully. The government also established that Jones left New York City for Alabama on November 8, 1985, one day after his arrest, in violation of his bail condition that he not depart from the southern or eastern districts of New York, and the jury convicted Jones of contempt. Finally, the Government established that Blackmon checked the answer "no" to a question on a CJA form (for court-appointed counsel) asking whether he had any cash on hand or money in a savings or checking account, at a time when he in fact had $41,000 in a safe deposit box held under an alias, and the jury convicted Blackmon of making a false statement in violation of 18 U.S.C. § 1001 (1982).

## Discussion

### A. Bank Fraud.

■ This is the first case in which this court has had occasion to construe the relatively new federal bank fraud statute, 18 U.S.C. § 1344 (Supp. IV 1986). Appellants contend that their bank fraud convictions should be reversed because neither the language of that statute nor its legislative history evinces a legislative intent to cover situations where money is merely withdrawn legally from a federally insured bank by a victim and where the bank itself is in no way victimized. We agree. Although the precise contours of the new law may be undefined as yet, we are confident that the conduct involved here is not within the intended reach of the legislation.

We begin, as we must, with the language of the statute, for if its language is unambiguous, that ordinarily ends our inquiry. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). The district court concluded that section 1344 has "plain and unambiguous meanings which squarely reach defendants' conduct." *United States v. Jones*, 648 F.Supp. 225, 231 (S.D.N.Y.1986). We do not agree.

Subsection (a) of the statute reads:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—
(1) to defraud a federally chartered or insured financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or *under the custody or control* of a federally chartered or insured financial institution *by means of false or fraudulent pretenses, representations, or promises*, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

18 U.S.C. § 1344(a) (Supp. IV 1986) (emphasis added).

It is true that the victims' money in this case had *at one time* been "under the custody or control" of federally insured banks. This, however, proves too much. The property obtained by the defendants' scheme was the foreign currency purchased by the victims with money legally withdrawn from the banks. At the time the foreign currency was obtained, it simply was not in any way under the control or custody of the banks. If the statute applied to these facts, it could apply to any situation where property purchased with money legally withdrawn from a federally insured bank was thereafter fraudulently obtained. The statute does not "plainly" yield such an extraordinary result.

Indeed, the government on appeal concedes that the property must be obtained at a time when the bank has custody or con-

---

**3.** Roland was not charged on the bank fraud counts involving victims Gloria Rosenfeld (counts six through eight) or Josephine Palum-
bo (count nine). Stephens was not charged on the Rosenfeld bank fraud counts.

trol of the property. The government argues that this element is met by virtue of the fact that the victims acted as the defendants' "agents" in withdrawing the money from the banks. The government cites 18 U.S.C. § 2(b) (1982), which states that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." As we have observed, "[t]his section is based on the precept that an individual with the requisite criminal intent may be held liable as a principal if he is a cause in fact in the commission of a crime, *notwithstanding that the proscribed conduct is achieved through the actions of innocent intermediaries." United States v. Margiotta*, 688 F.2d 108, 131 (2d Cir.1982) (emphasis added) (footnote omitted), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed. 2d 282 (1983).

The application of the "innocent intermediary" doctrine to the facts here, however, would badly strain the logic of section 2(b). The withdrawals of money from the banks were perfectly legal. Moreover, the withdrawals were not undertaken "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(a)(2) (Supp. IV 1986). Thus, even if those legal withdrawals were imputed to the defendants, the imputed acts would not constitute conduct proscribed by law. *Margiotta* is distinguishable in that the acts of the intermediaries in that case would have been criminal if the intermediaries had had the same requisite criminal intent as the defendant. 688 F.2d at 131–32. In the instant case, no intent or other legal element

provided by the defendants could convert the legal, non-fraudulent withdrawal of funds from the banks by the victims into a fraudulent obtaining of funds under the custody or control of the banks.[4]

We accordingly conclude that the language of section 1344 does not "unambiguously" or "plainly" cover the conduct involved in this case. It is therefore appropriate to look to the legislative history for further guidance as to the scope of the bank fraud law. *See Watt v. Alaska*, 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981); *United States v. Perdue Farms, Inc.*, 680 F.2d 277, 280 (2d Cir.1982). This history makes it abundantly clear that Congress did not intend the bank fraud statute to cover ordinary state law offenses where, as here, the fraud victim was not a federally insured bank.

The Senate report regarding this provision states that "[t]he offense of bank fraud in this part is designed to provide an effective vehicle for the prosecution of frauds in which *the victims are financial institutions that are federally created, controlled or insured." *S.Rep. No. 225, 98th Cong., 2nd Sess. 377 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3517 (emphasis added). The House report similarly states that this section is concerned with "fraudulent schemes where banks are victims," H.R.Rep. No. 901, 98th Cong., 2d Sess. 2 (1984), and explains that subsection (a) of Section 1344 "makes it an offense for any person, having devised a scheme or intending to devise a scheme to defraud a national credit institution or *to obtain property of such an institution,*[5]

---

**4.** It is true that "a person may be held responsible as a principal under 18 U.S.C. § 2(b) … for causing another to do an act which would not have been criminal if it had been performed independently by that other person." *United States v. Kelner*, 534 F.2d 1020, 1022 (2d Cir.) (citations omitted), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976). *See also United States v. De Cavalcante*, 440 F.2d 1264, 1268 (3d Cir.1971). In the case at bar, however, the objection is not merely that the withdrawals were legal acts on the parts of the victims themselves; rather, it is that we find it difficult to conceive of any way in which an *authorized, nonfraudulent* withdrawal from a bank by one person could constitute a fraudulent obtainment

from a bank by another person. This elaborate and illogical legal fiction is simply the result of the government's attempt to establish federal jurisdiction under section 1344(a)(2) in the face of its inability to establish fraudulent obtainment of funds at a time when those funds were under the custody or control of a federally insured bank.

**5.** The district court concluded that the structure of section 1344(a) reflects two separate intentions (noting that terms connected in the disjunctive should be given separate meanings, *Garcia v. United States*, 469 U.S. 70, 73, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984)); *i.e.*, under subsection (1), the fraud victim must be a bank,

knowingly to engage in conduct in furtherance of the scheme." *Id.* at 6 (emphasis added). The federal interest underlying the legislation is "protecting the financial integrity of these institutions." S.Rep. No. 225 at 377, 1984 U.S.Code Cong. & Admin. News 3517. Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2).

Moreover, it is worth noting that the House Judiciary Committee, in considering the proposed bank fraud statute, was particularly concerned about the case law development of federal jurisdiction under the mail fraud, 18 U.S.C. § 1341 (1982), and wire fraud, 18 U.S.C. § 1343 (1982), statutes:

> The Committee, however, is concerned by the history of expansive interpretations of that language [*i.e.,* "scheme to defraud" in 18 U.S.C. §§ 1341 and 1343] by the courts. The current scope of the wire and mail fraud offenses is clearly greater than that intended by Congress. Although the Committee endorses the current interpretations of the language, it does not anticipate any further expansions. The Committee believes that while the additional activity that could thus be brought within the purview of the language might well be reprehensible, and probably should be criminal, due process and notice argue for prohibiting such conduct explicitly, rather than through court expansion of coverage.

H.R.Rep. No. 901 at 4. It would seem odd indeed if the same committee that expressed concern about judicial expansion of coverage under the wire and mail fraud statutes intended a similar fate for the bank fraud statute it was proposing.

Finally, expansion of the coverage of section 1344 to include conduct that does not victimize federally insured banks and that is already criminal under state law would also implicate concerns of federalism. The Supreme Court has observed, for example, that expansive application of the Travel Act, 18 U.S.C. § 1952 (1982), to activity "traditionally subject to state regulation" and to defendants who themselves did not travel interstate (but whose betting customers did) "would alter sensitive federal-state relationships" and "could overextend limited federal police resources." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). *See United States v. Archer,* 486 F.2d 670, 680 (2d Cir.1973). *See generally* R.J. Miner, *Federal Courts, Federal Crimes, and Federalism,* 10 Harv.J.L. & Pub.Pol'y 117, 124–27 (1987). As indicated *supra,* note 5, the Supreme Court has recently cut back on judicial expansion of the mail fraud statute, 18 U.S.C. § 1341 (1982), expressing similar concerns. *McNally v. United States,* — U.S. —, —, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987).

In sum, neither the language of section 1344, the attendant legislative history, nor the pertinent judicial precedents warrant the application of that statute to the facts

---

whereas under subsection (2), the victim need not be a bank as long as property under the custody or control of a bank is obtained. 648 F.Supp. at 231. First, this distinction is not determinative here, since we have already concluded that under the facts of this case no property was unlawfully obtained at a time when it was under the custody or control of a bank. Second, if property *were* obtained at such time as it was under the custody or control of a bank, the bank would certainly be a victim. *See United States v. Lankford,* 573 F.2d 1051, 1053–54 (8th Cir.1978) (when property is deposited in a bank, the bank owes a duty of care to protect those using its services); *United States v. Dix,* 491 F.2d 225, 227 (9th Cir.1974) (same). Third, the legislative history suggests that the victimization of banks is the concern of subsection (a)

in its entirety, and that subsection (a)(2) is designed to protect against schemes "to obtain property of such an institution...." H.R.Rep. No. 901 at 4, 6. Finally, as the Supreme Court recently observed with respect to the federal mail fraud statute, 18 U.S.C. § 1341 (1982), (upon which the bank fraud statute was largely modelled), terms connected in the disjunctive need not always be construed independently so that the limits applicable to one term are inapplicable to the second, especially when such a construction would leave the statute's "outer boundaries ambiguous" and involve the federal government in areas more properly left to states and localities. *McNally v. United States,* — U.S. —, —, 107 S.Ct. 2875, 2880–81, 97 L.Ed. 2d 292 (1987).

of this case. Accordingly, all the bank fraud convictions must be reversed.

### B. *Substantive Wire Fraud.*

Turning to the substantive wire fraud counts under 18 U.S.C. section 1343 (1982),[6] appellants contend first that the trial judge improperly failed to instruct the jury that the appellants must have foreseen not only a wire communication by a third party, but also the interstate character of that communication. The only interstate wire communications involved in this case were two instances in which one of the victims, Peggy St. Lewis, instructed Merrill Lynch to transfer money by wire from Florida to New York. Judge Haight instructed the jury that "if you find that the wire communication was reasonably foreseeable and that the interstate wire communication charged in the indictment took place, then this element is satisfied even if it was not foreseeable that the wire communication made would be interstate." Appellants argue that, on the contrary, a person does not cause an interstate wire communication by a third party under section 1343 unless it was foreseeable not only that there would be a wire communication connected with the fraud, but that the wire communication would be interstate.

This court has unambiguously held that there is no *mens rea* requirement as to the purely jurisdictional element of interstate communication under the wire fraud statute. *United States v. Blassingame*, 427 F.2d 329, 330–31 (2d Cir.1970), *cert. denied*, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971). As the Eighth Circuit has recently observed, the only *mens rea* requirements are that the defendant "be a party to some kind of scheme to defraud, a requirement that includes a high degree of *scienter* and moral culpability," and that "the use of wire communication be reasonably foreseeable." *United States v. Bryant*, 766 F.2d

370, 375 (8th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986). The element of "interstate nexus" is not a substantive element of the offense, but arises only from "constitutional limitations on congressional power over intrastate activities under the Commerce Clause." *Id. See Blassingame*, 427 F.2d at 330–31. *Cf. United States v. Feola*, 420 U.S. 671, 686–87, 95 S.Ct. 1255, 1264–65, 43 L.Ed.2d 541 (1975) (conviction for conspiracy to violate statute prohibiting assault on a federal officer does not require knowledge by defendant that the victim was a federal officer); *United States v. Muza*, 788 F.2d 1309, 1311–12 (8th Cir.1986) (conviction under federal arson statute does not require knowledge that the building destroyed by arson was used in an activity affecting interstate commerce); *United States v. Roglieri*, 700 F.2d 883, 885 (2d Cir.1983) (conviction under statute prohibiting possession of material stolen from the mail does not require knowledge that material was stolen from the mail, but only that material was stolen); *United States v. Le-Faivre*, 507 F.2d 1288, 1298 (4th Cir.1974) (use of interstate facilities is a jurisdictional element and does not require an additional *mens rea* beyond that required for the underlying gambling activity in violation of the Travel Act), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

Appellants claim, however, that the issue is different when an innocent third party makes the interstate communication, citing *United States v. Muni*, 668 F.2d 87 (2d Cir.1981). *Muni* expressly held that a defendant could be criminally liable where the interstate wire communication was made by an innocent third party, so long as that communication was reasonably foreseeable. *Id.* at 89–90. *Muni* declined to decide whether the interstate character of the communication must also be foreseeable. *Id.* at 90 n. 7.

---

6. 18 U.S.C. § 1343 (1982) reads:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits *or causes to be transmitted* by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
*Id.* (emphasis added).

■ We conclude[7] that it is sufficient that appellants could reasonably have foreseen the use of a wire communication by Peggy St. Lewis, whether or not the interstate nature of that communication was reasonably foreseeable.[8] While *Blassingame* did not involve a defendant who caused a third party to make a wire communication, it did involve a defendant who himself made an interstate wire communication without knowing that it was interstate. *Blassingame,* 427 F.2d at 330. Since, as the cases clearly establish, the only purpose of the "interstate" requirement is jurisdictional, we see no basis in principle for distinguishing *Blassingame,* and therefore apply its rule to the facts presented here.[9]

■ Nevertheless, the substantive wire fraud convictions cannot be sustained because of reversible errors elsewhere in the trial court's instructions. First, the court incorrectly stated the law concerning criminal liability for substantive offenses committed by other members of a conspiracy prior to a particular defendant's entry into the conspiracy. In his main instruction, the trial judge stated:

> It also is not necessary that the defendant participated in the alleged scheme from its inception. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and who intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter.

J.App. 51. In response to the jury's request for clarification of this instruction, the trial judge repeated the above language (with minor editing) and added the following instruction:

> So long as the transaction is within the general scope of the scheme on which all defendants had embarked a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed. It follows that as to all defendants who were members of a single scheme *it is your duty to find them guilty of all substantive crimes* committed in furtherance of that single scheme whether or not they were directly involved in a particular fraudulent transaction.

J.App. 132 (emphasis added).

Judge Haight commented on this instruction in his post-trial opinion as follows:

> [C]ounsel characterizes the supplemental charge as improperly telling "the jury that it was their 'duty' to convict a defendant retroactively as to women who were defrauded before he joined the scheme." ... In the first place, under settled law "retroactive" responsibility attaches to a co-conspirator or co-schemer who knowingly joins a conspiracy or scheme after it began. He ratifies what has gone before.

648 F.Supp. at 235–36 n. 8.

The confusion here is that, with regard to liability for *conspiracy,* a defendant may be legally responsible for acts of coconspirators prior to that defendant's entry into the conspiracy, *United States v. Guillette,* 547 F.2d 743, 751 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977),

---

7. Although this conclusion does not affect the result on substantive wire fraud counts, for reasons presently to be discussed, it is relevant to the affirmance of the convictions of all defendants for conspiracy to commit wire fraud. See *infra* section C.

8. We note also that all defendants were charged under 18 U.S.C. § 2 (1982) with respect to the substantive wire fraud counts. In this connection, see *United States v. Sigalow,* 812 F.2d 783, 785–86 (2d Cir.1987) (under Travel Act, 18 U.S.C. § 1952 (1982), aider and abettor could be convicted even if he had no knowledge of the use of interstate facilities, so long as he willfully and knowingly aided a prostitution enterprise that was in fact promoted by mail).

9. The other cases cited by appellants, *United States v. Carpenter,* 791 F.2d 1024, 1035 (2d Cir.1986), *aff'd,* —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), and *United States v. De Biasi,* 712 F.2d 785, 791–92 (2d Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983), did not reach this issue (or cite or discuss *Blassingame* ) because they found the interstate character of the wire communication reasonably foreseeable.

whereas, with regard to *substantive offenses,* a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy. *Levine v. United States,* 383 U.S. 265, 266, 86 S.Ct. 925, 925, 15 L.Ed.2d 737 (1966) (per curiam); *United States v. Harrell,* 737 F.2d 971, 981 (11th Cir.1984), *cert. denied,* 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985). *See United States v. Carrascal–Olivera,* 755 F.2d 1446, 1452 n. 8 (11th Cir.1985) (explaining the distinction). By stating that the jury must convict a member of the conspiracy for substantive offenses committed by co-conspirators prior to the member's entry into the conspiracy, the judge clearly instructed the jury contrary to settled law. Therefore, we find the instruction to be reversible error [10] as to defendants whom the jury could have found to have joined the conspiracy after the substantive wire fraud offenses had been committed.[11]

■ We find a second, related error in the trial judge's instruction concerning vicarious liability and the *Pinkerton* doctrine. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *See generally United States v. Molina,* 581 F.2d 56, 60–61 (2d Cir.1978). In his main instruction, the trial judge charged the jury that if a defendant was found to be a member of the wire fraud conspiracy charged in count one of the indictment, *"you may also but you are not required to,* find him or her guilty of the substantive crime charged against that defendant in Counts Three through Five," provided that the person who actually com-

mitted the crime was a member of that conspiracy, that the crime was committed in furtherance of the conspiracy, and that the wire fraud could be foreseen as a consequence of the conspiracy. J.App. 60–61 (emphasis added). Judge Haight then repeated that if the jury found these elements, *"you may, but you need not,* find that defendant guilty of the particular wire fraud count you are considering, even though he did not personally participate in the acts constituting the crime or did not have actual knowledge of it." J.App. 61 (emphasis added). Finally, the judge once more emphasized the discretion of the jury to use the *Pinkerton* option: "The reason for this option—*which again, you may or may not use, it is entirely up to you*—is simply that a co-conspirator who commits a substantive crime pursuant to a conspiracy is deemed to be the agent of the other conspirators." *Id.* (emphasis added).

This charge properly instructed the jury as to the essential elements of the *Pinkerton* doctrine. *See United States v. Alvarez,* 755 F.2d 830, 848 & n. 22 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). In the same jury note that later requested clarification on retroactivity, however, the jury also asked if application of the *Pinkerton* theory was "mandatory" or whether "discretion [may] be applied so that only those who are determined to be directly involved in carrying out the scheme with a particular victim is [sic] guilty with respect to that victim?" J.App. 116. In response, the judge charged the jury—in the same context as he charged the jury concerning retroactive lia-

---

**10.** The government cites *United States v. Lam Lek Chong,* 544 F.2d 58, 68 (2d Cir.1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977), to support its contention that defense counsel did not preserve their objection to the erroneous jury instruction because, it is argued, the alternative instruction offered by counsel was itself legally inaccurate. The error we find here was not the judge's decision to reject defense counsel's alternative instruction, as was the alleged error in *Lam Lek Chong,* 544 F.2d at 67–68, *United States v. Ouimette,* 798 F.2d 47, 49–50 (2d Cir.1986), and *United States v. Leonard,* 524 F.2d 1076, 1084 (2d Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). Unlike the situation in those cases, the error here was a misleading

statement of the law in the judge's own instruction, to which defense counsel objected. *Cf. United States v. Martinez–Carcano,* 557 F.2d 966, 969 (2d Cir.1977) (where defense counsel made no objection to judge's proposed charge and where such charge was adequate on the whole, there was no plain error to warrant reversal).

**11.** Since there was further error in the instructions concerning the substantive wire fraud counts, which undermines all the convictions on these counts, it is unnecessary to parse the evidence to determine which defendants would benefit from our ruling on the "retroactivity" issue.

bility—that "as to all defendants who were members of a single scheme *it is your duty to find them guilty of all substantive crimes* committed in furtherance of that single scheme whether or not they were directly involved in a particular fraudulent transaction." J.App. 132 (emphasis added).

It seems to us that Judge Haight's initial *Pinkerton* charge, indicating that the jury might in its discretion, but need not, find members of a conspiracy guilty of reasonably foreseeable substantive crimes committed during their membership in, and in furtherance of, the conspiracy, correctly stated the law. In *Pinkerton* itself, the Supreme Court stated that "[t]he question was submitted to the jury on the theory that each petitioner *could* be found guilty of the substantive offenses" under the circumstances stated above, *Pinkerton v. United States*, 328 U.S. 640, 645, 66 S.Ct. 1180, 1183, 90 L.Ed. 1489 (1946) (emphasis added), approving an instruction that the jury had "a right ... to convict each of these defendants on all these substantive counts." *Id.* at 645 n. 6, 66 S.Ct. at 1183 n. 6. And in *United States v. Miller*, 478 F.2d 1315 (2d Cir.1973), where the trial court oscillated from a discretionary to a mandatory and finally back to a discretionary charge, we concluded that the (discretionary) end result was "correct, unobjectionable and unobjected to," *id.* at 1320, although without specific reference to *Pinkerton*.[12]

In any event, it was clearly prejudicial error to give a discretionary *Pinkerton* instruction at the close of the trial, upon the basis of which defense counsel made their summations, and then switch to a mandatory charge in response to an inquiry by the jury during its deliberations. This error requires that the convictions of all defendants for substantive wire fraud (counts three and four) be vacated.

## C. *Wire Fraud Conspiracy.*

■ Having concluded, *supra* section B, that the substantive wire fraud offense does not include a *mens rea* requirement as to the jurisdictional element, we also conclude that conviction for conspiracy[13] to commit wire fraud does not require foreseeability of the interstate nature of the wire communication by a third party. The Supreme Court has held that, with an exception not here relevant, "where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a *mens rea* requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense." *United States v. Feola*, 420 U.S. 671, 696, 95 S.Ct. 1255, 1269, 43 L.Ed.2d 541 (1975). *See United States v. LeFaivre*, 507 F.2d 1288, 1299 (4th Cir.1974) ("[t]he jurisdictional element should be viewed for purposes of the conspiracy count exactly as we view it for purposes of the substantive offense—simply as a jurisdictional peg on

---

**12.** There is a certain lack of clarity in the cases as to the mandatory/discretionary dichotomy. *See, e.g., United States v. Zabic,* 745 F.2d 464 (7th Cir.1984), quoting the trial judge's charge that under the conditions stipulated in *Pinkerton* a defendant "may" be found guilty, *id.* at 474, which was followed by a further charge that under those conditions the acts of the coconspirator who personally committed the substantive crime "are the acts of the defendant." *Id.* at 475. *Compare United States v. Neapolitan,* 791 F.2d 489, 505 (7th Cir.) (jury instructed that it "may" find defendant guilty of substantive crimes committed by coconspirator and also instructed in detail concerning personal nature of guilt, in context of "a *Pinkerton* instruction which already appeared to give the jury discretion as to whether to invoke the doctrine"), *cert. denied,* — U.S. —, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). *Cf. United States v. Basey,* 816 F.2d

980, 999 n. 36 (5th Cir.1987) (quoting a Seventh Circuit model jury instruction that a defendant "should" be found guilty of a substantive count when the *Pinkerton* conditions are established). In addition, the cases appear to provide little guidance, where a discretionary *Pinkerton* instruction is given, as to the standards by which the exercise of that discretion should be guided.

**13.** 18 U.S.C. § 371 (1982) provides, in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

which to hang the federal prosecution"), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. Roselli,* 432 F.2d 879, 891–92 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

We also conclude that the conspiracy convictions need not be reversed because of prejudicial "spillover" from the instructions concerning retroactive and vicarious liability, discussed *supra* section B. While we have concluded that the judge's instruction on retroactive liability for actions of coconspirators prejudiced the defendants as to the substantive wire fraud counts, there could be no such prejudice as to the conspiracy count. The reason is that, for purposes of conviction for conspiracy (as opposed to conviction for substantive offenses), a coconspirator *is* liable for acts committed in furtherance of the conspiracy prior to his entry into the conspiracy. *United States v. Ebner,* 782 F.2d 1120, 1127 (2d Cir.1986); *United States v. Michel,* 588 F.2d 986, 1002 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed. 2d 32 (1979); *United States v. Guillette,* 547 F.2d 743, 751 (2d Cir.1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *United States v. Bridgeman,* 523 F.2d 1099, 1107–08 (D.C.Cir.1975), *cert. denied,* 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976). As applied to the conspiracy count, the judge's instruction on retroactivity was accordingly correct and could not have misled the jury.

Similarly, the trial court's charge concerning vicarious *Pinkerton* liability for substantive offenses did not prejudice the defendants as to the conspiracy count. Regardless of the confusion between instructions as to "mandatory" and "discretionary" conviction for substantive offenses, *see supra* section B, the jury was repeatedly and unambiguously instructed that even to convict under *Pinkerton,* it must first find that the government had established the "existence of a single overall scheme" and that each defendant was a "member of that scheme." J.App. 131–32. Moreover, from the note submitted to the court by the jury, it does not appear that the jury had

any questions about the conspiracy count, but only about vicarious liability for the substantive offenses. Further, there is no suggestion that Judge Haight's instruction concerning the conspiracy count itself was in any way deficient. We accordingly see no basis for reversal of the conspiracy conviction.

One Second Circuit precedent, not cited to us by the parties, gives us pause in reaching this conclusion. In *United States v. Cantone,* 426 F.2d 902 (2d Cir.), *cert. denied,* 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed. 2d 57 (1970), we said:

> The trial judge's erroneous submission to the jury of the issue of Rosen's guilt on the substantive count and the giving of the *Pinkerton* charge undoubtedly influenced the jury's finding of Rosen's guilt on the conspiracy charge. We conclude that the errors with respect to the substantive count so tainted Rosen's conspiracy conviction that we must also reverse that count.

*Id.* at 905.

In *Cantone,* however, the defendant in question did not personally participate in the substantive offense, and was held responsible therefor only on a *Pinkerton* theory, which we determined to be error because "the evidence on this issue was insufficient to establish beyond a reasonable doubt that [defendant] had joined with [codefendant] in [the relevant] conspiracy before July 28, 1964," the date when the substantive offense was committed. *Id.* at 904. *See United States v. Vargas,* 615 F.2d 952, 961–62 (2d Cir.1980) (substantive and conspiracy convictions affirmed despite challenge to *Pinkerton* instruction, *Cantone* distinguished because "evidence [in *Cantone* ] insufficient to prove conspiracy beyond a reasonable doubt"); *United States v. Sperling,* 506 F.2d 1323, 1343 n. 29 (2d Cir.1974) (also construing *Cantone* as finding "insufficient proof [defendant] was a member of the conspiracy in furtherance of which the substantive offense was committed"), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

There is no challenge here to the sufficiency of the evidence that these defendants were members of the conspiracy charged in count one of the indictment. We accordingly regard *Cantone* as distinguishable, and not controlling our decision here.

■ Defendant-appellant Stephens raises an additional issue, pertinent to his conviction for conspiracy, that merits our attention. Stephens contends that the trial court erroneously admitted hearsay evidence—in the form of testimony from Blackmon's former girlfriend, Constance Tryban—concerning statements made by Blackmon to Tryban. Tryban testified that she had asked Blackmon "how we were going to come up with the money for the live bank to count down to the lame," and that Blackmon "had told me between Sidney [Jones], Tyrone [Stephens] and Derek [Blackmon], they would come up with a live bank." Tryban also testified that Blackmon later told her that Stephens did not leave New York with Cecilia Roland because Stephens "was sticking around to bankroll anything that we needed so far as the lame." Judge Haight initially decided that this testimony was not admissible as "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy," Fed.R.Evid. 801(d)(2)(E), but thereafter admitted it as statements against Blackmon's penal interest, Fed.R. Evid. 804(b)(3). The judge subsequently decided that the testimony "as further developed" was admissible under Rule 801(d)(2)(E), as well, during his rulings on defendants' Rule 29 motions at the end of the government's case.

Stephens argues that Blackmon's statements to Tryban were not made "in furtherance of the conspiracy" within the meaning of 801(d)(2)(E). Stephens cites the rationale of the trial court's initial determination:

A statement is in furtherance of a conspiracy if its intent is to cause something to happen or to cause someone to do something which would further the course of the conspiracy and achieve its purposes.... In the case of Miss Tryban, I was not persuaded by the government that references to funding from other people, Mr. Stephens or anyone else, were said to Miss Tryban with the purpose of inducing her to do anything.... [O]n the present record, my perception of Miss Tryban is that she was on board, she was a member of the crew, she was doing ... and she was prepared to go on doing what she was told.

And consequently I see nothing in the testimony which I excluded which could fairly be regarded as inducing any action on the part of Constance Tryban.

Trial transcript at 1419–21.

This court has several times observed that statements "that apprise a coconspirator of the progress of a conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir.1987), or that "brief [a coconspirator] on the scheme," *United States v. Mangan*, 575 F.2d 32, 44 (2d Cir.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978), are statements made in furtherance of a conspiracy. *See United States v. Paone*, 782 F.2d 386, 391 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3261, 97 L.Ed.2d 761 (1987). *See also United States v. Persico*, 832 F.2d 705, 716 (2d Cir.1987). The Third Circuit has likewise observed that statements by coconspirators that "inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir.) (citations omitted), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). At the very least, the statements made by Blackmon to Tryban apprised her of the current status of funding for the cash packages that were vital to the "pigeon drop" game.[14] This court has found, for

14. It is true that Peggy St. Lewis did not actually require a "count down." Nevertheless, a "live bank" was needed in case any of the "lames" required a count down. See *supra*, note 2, for a description of the role of the "count down" in the "pigeon drop" game. Whether or not the live bank was ultimately needed for the St. Lewis wire fraud, it is reasonable to conclude

example, that statements indicating a "steady source of supply" for illegal drugs, *United States v. Cambindo Valencia,* 609 F.2d 603, 632 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1986), are in furtherance of a conspiracy to distribute narcotics. *See also United States v. Rahme,* 813 F.2d at 36.

Such statements, like Blackmon's response to Tryban's question about "live bank" sources, promote cooperation among coconspirators by emphasizing the availability of essential prerequisites for the success of the criminal enterprise. *See id.* at 35–36 (statements that provide reassurance or serve to maintain trust and cohesiveness among coconspirators further the ends of the conspiracy); *United States v. Ammar,* 714 F.2d at 252. Blackmon's statements were not " 'merely narrative' declaration[s] of a past fact," *United States v. Birnbaum,* 337 F.2d 490, 495 (2d Cir.1964), but "[t]hey looked rather to the future." *United States v. Mangan,* 575 F.2d at 43. Moreover, the remarks about continued future funding were not statements pertaining to incidental facts that were relatively unimportant to the aims of the alleged conspiracy. *Cf. United States v. Eubanks,* 591 F.2d 513, 520–21 (9th Cir. 1979) (conversation between conspirators that did nothing to advance aims of conspiracy inadmissible).

Under these circumstances, and despite the trial judge's initial ruling, we agree with his ultimate conclusion that the statements were admissible under 801(d)(2)(E).[15] As for Stephens' claim that the declarations do not bear adequate indicia of reliability to satisfy the confrontation clause of the sixth amendment, we find the matter to be settled by the Supreme Court's recent decision in *Bourjaily v. United States,* ——

U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), finding the requirements of Rule 801(d)(2)(E) and the confrontation clause coextensive.[16]

We therefore affirm the convictions of all defendants on count one, conspiracy to commit wire fraud.

### D.  *Credit Card Fraud.*

■  Blackmon and Jones challenge their convictions for "knowingly and with intent to defraud possess[ing] fifteen or more … unauthorized access devices." 18 U.S.C. § 1029(a)(3) (Supp.IV 1986). They contend that the trial judge improperly refused to give a requested instruction that "intent to defraud," within the meaning of this relatively new statute, is limited to intent to defraud a credit card holder or credit card company. This refusal allowed the jury to convict the defendants on the prosecution's theory that Blackmon and Jones intended to use unauthorized credit cards as false identification in connection with frauds upon victims who were neither the owners nor the issuers of the cards.

As with the new bank fraud statute, the trial court found that the plain language of the new credit card fraud statute applied to the defendants' conduct. While the argument that the plain statutory language covers the defendants' conduct is more tenable in the case of section 1029 than it was in the case of section 1344, we conclude that Congress did not intend the law to cover the use of credit cards as false identification.

Where statutory language is unambiguous, and where there is an absence of "a clearly expressed legislative intent to the contrary," the statutory language "must ordinarily be regarded as conclusive." *United States v. Turkette,* 452 U.S. 576,

---

that Blackmon's statement to Tryban reassured her that a live bank would be available if needed for any of the victims.

**15.** Since the statements were admissible under Rule 801(d)(2)(E), we need not reach the issue whether the statements were admissible under Rule 804(b)(3) as admissions against penal interest.

**16.** We might add that we are simply mystified by the assertion in Stephens' reply brief that

*United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), precludes admission of these statements pursuant to Rule 801(d)(2)(E). *Inadi* held that the confrontation clause of the sixth amendment does not require a showing of the declarant's unavailability as a condition to the admission of his statement pursuant to Rule 801(d)(2)(E). It does not address the issue with which we are presented.

580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).[17] *See also Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983) (quoting *Turkette*). Nevertheless, "[t]he circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981).

While the common meaning of "fraud" may include the use of unauthorized credit cards to establish a false identity in aid of a "pigeon drop" scheme, the circumstances of the enactment of section 1029 indicate that Congress did not intend such a meaning. First, neither the statutory language nor the legislative history anywhere mentions the use of credit cards as false identification. The legislative history refers only to the concern over increasingly sophisticated schemes by counterfeiters and traffickers to defraud financial institutions by obtaining account numbers or stolen and lost access cards which are then used in ordinary credit transactions. *See* H.R.Rep. No. 894, 98th Cong., 2d Sess. 4–8 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3689. Second, the statutory definition of "access device" reinforces the impression that Congress was focused upon the fraudulent use of such devices in connection with credit transactions: "the term 'access device' means any card, plate, code, account number, or other means of account access *that can be used*

... *to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds....*" 18 U.S.C. § 1029(e)(1) (Supp.IV 1986) (emphasis added). *See also* H.R.Rep. No. 894 at 19, 1984 U.S.Code Cong. & Admin.News 3705 (section 1029(e)(1) encompasses "manifestations of access devices used between merchants and credit card companies for payment for access device transactions"). Third, when Congress did act upon the subject of false identification with respect to other relatively contemporaneous legislation, it expressly rejected a proposal to regulate certain "private identification cards," and instead chose to cover only government-issued identification documents. *See* 18 U.S.C. § 1028(d)(1) (1982 and Supp.IV 1986);[18] H.R.Rep. No. 802, 97th Cong., 2d Sess. 6–7, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3519, 3524–25. One of the reasons that the subcommittee rejected the private identification proposal was that "unlike documents apparently issued by a government authority, fraudulent private identification cards could be adequately policed by state and local officials." H.R.Rep. No. 802 at 6–7, 1982 U.S.Code Cong. & Admin.News 3525.

In *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), the Supreme Court refused to entertain an expansive interpretation of the intent provision of the Travel Act, 18 U.S.C. § 1952(a) (1982), which would have "transform[ed] relatively minor state offenses into federal felonies." *Id.* at 812. *See also McNally v. United States*, —— U.S. ——, ——, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987);

---

**17.** We note in this connection, however, that section 1029 contains neither a definition of "defraud" or "intent to defraud," nor an express limitation of the sort for which Blackmon and Jones contend.

**18.** Subsections (a) through (c) of section 1028, which is entitled "Fraud and related activity in connection with identification documents," deals with the proscribed criminal activity relating to such documents and the related punishments. Subsection (d)(1), part of the definitional provisions, states:

(d) As used in this section—
(1) the term "identification document" means a document made or issued by or un-

der the authority of the United States Government, a State, political subdivision of a State, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals.

Section 1028 is the basis for count thirty-two of the indictment; Blackmon's and Jones' convictions thereunder are affirmed in this opinion.

*Erlenbaugh v. United States,* 409 U.S. 239, 247 n. 21, 93 S.Ct. 477, 482 n. 21, 34 L.Ed. 2d 446 (1972). *See generally* R.J. Miner, *Federal Courts, Federal Crimes, and Federalism,* 19 Harv.J.L. & Pub.Pol'y 117, 124–27 (1987).

A similar analysis is appropriate here. We conclude that the trial judge's failure to give the requested instruction on "intent to defraud" constituted error, and accordingly vacate and remand the convictions of Blackmon and Jones under count 31. We do not accept, however, Jones' contention that there was insufficient evidence to convict him on this count.

E. *Jury Note.*

■ Appellants contend that the trial judge committed reversible error when he responded, without consulting counsel, to a jury note. On the fourth day of deliberations, at about 3:30 p.m., the jury sent the following note in response to the marshall's distribution of dinner menus: "Please remember one juror cannot work past 6:30." The trial judge returned the note with the following response written on the bottom:

> Which juror, and is it absolutely impossible to work this evening? I said to you yesterday that we would work tonight, if necessary, and I feel that we must.

The jury responded at 3:40 p.m. that "[w]e have reached a decision on [all] counts, but one count (33)." Judge Haight attempted to consult with counsel about the second jury note and did not communicate further with the jury. The jury reached a verdict on all counts by 3:55 p.m., apparently before the judge had an opportunity to consult with counsel.

The wording of the judge's response—especially the introductory question, which suggested that the judge was not inflexible on the subject—and the fact that the jury reached its verdict over two and a half hours before the 6:30 limit suggested in its own note, convince us that the judge's response did not coerce the jury into returning a verdict. This is a far cry from the situation in *United States v. Ronder,* 639 F.2d 931 (2d Cir.1981), where the judge urged the jury to avoid a deadlock despite the jury's note "firmly reporting a deadlock," *id.* at 932, and where the judge's words "might have given the jury the impression that the Government's interest in a verdict was more meritorious than the purely personal concerns of the defendant." *Id.* at 932–33. Yet even under the *Ronder* facts, this court found that "the issue is close." *Id.* at 934.

We similarly find *Krische v. Smith,* 662 F.2d 177 (2d Cir.1981), distinguishable, even though that case emphasized the importance of the fact that the jury, as here, deliberated for only a brief period after the improper communication. *Id.* at 179. *Krische,* like *Ronder,* involved a situation where the judge was directly responding to a jury note indicating an inability to reach agreement. *Id.* at 178. *Cf. United States v. Rodriguez,* 545 F.2d 829, 830 (2d Cir. 1976) (conviction affirmed despite court response to jury note indicating deadlock without notice to counsel), *cert. denied,* 434 U.S. 819, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). Here, the first jury note did not indicate deadlock, but only the wish of one juror not to work beyond 6:30. Therefore, unlike the case in *Ronder* and *Krische,* the judge's response cannot fairly be construed as coercing the jurors to resolve differences among themselves which they had expressly concluded to be irresolvable.

We recognize that it was error for the judge to have responded to the jury note without consulting counsel. "It is settled law that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *United States v. Ronder,* 639 F.2d at 934 (citations omitted). We take the trial judge's departure from this rule very seriously. Nonetheless, "[o]ur inquiry ... cannot end with citation of the general proposition. A violation of the defendant's rights may, under limited circumstances, constitute harmless error and therefore not justify the reversal of a conviction." *Krische v. Smith,* 662 F.2d at 179. For the reasons stated above, we find the error here to be harmless.

F. *The Remaining Counts.*

■ We find that the conviction of Blackmon under 18 U.S.C. § 1001 (1982) for filing a false affidavit to obtain court-appointed counsel is fully supported by the evidence. It was clearly reasonable for the jury to find that Blackmon's response of "no" to the CJA form question, "Have you any cash on hand or money in savings or checking account?", was a willful falsification when Blackmon knew that he had access to $41,000 in a bank safe deposit box held under an alias. The trial judge amply instructed the jury that it must consider whether Blackmon simply misunderstood the question or made an honest mistake. Moreover, because the CJA form contained a warning in bold letters that a "false or dishonest" answer was punishable by fine or imprisonment, and because Blackmon's holding of the deposit box under an alias could suggest active concealment of his ownership, we do not find the "exculpatory no" doctrine applicable. *United States v. Grotke,* 702 F.2d 49, 53 (2d Cir.1983). The submission of a false affidavit to obtain court-appointed counsel is a serious matter. We conclude that the jury reasonably found that Blackmon did so knowingly and willfully.

We find the challenges of Jones and Blackmon to their convictions under 18 U.S.C. §§ 1028(a)(3) (1982 and Supp.IV 1986) and 2 (1982) for possession of identification documents with intent to use them unlawfully, and the challenge of Jones to his conviction under 18 U.S.C. § 401 (1982) for contempt in disobeying the conditions of his bail, to be without merit. We also reject Stephens' challenges to his convictions based on an assertedly suggestive photo array and alleged errors in the form of the indictment.

G. *Disposition of this Appeal.*

By way of summary, we affirm the conviction of all appellants on count 1 (conspiracy to commit wire fraud), of Blackmon and Jones on count 32 (possessing five or more identification documents with intent to use them unlawfully), of Blackmon on count 33 (filing a false affidavit to obtain court-appointed counsel), and of Jones on count 34 (criminal contempt for violating bail conditions). We reverse the convictions of all appellants on counts 6–20 (bank fraud). We vacate the convictions of all appellants on counts 3 and 4 (substantive wire fraud), and of Blackmon and Jones on count 31 (possession of fifteen or more unauthorized access devices with intent to defraud).

On all counts as to which we have affirmed the convictions, we remand for reconsideration of sentencing. *See United States v. Petrov,* 747 F.2d 824, 832 (2d Cir.1984) (citing *United States v. Hines,* 256 F.2d 561, 563 (2d Cir.1958)), *cert. denied,* 471 U.S. 1025, 105 S.Ct. 2037, 85 L.Ed.2d 313 (1985). Up to this point, we have not relied upon the discretionary "concurrent sentence" doctrine, *see United States v. Vargas,* 615 F.2d 952, 956–60 (2d Cir.1980), but have instead reached the merits even on those counts for which appellants have received sentences to run concurrently with the sentences for convictions we affirm. We likewise decline to invoke that doctrine to leave intact the sentences for the convictions we affirm, because we are not confident that the severity of the concurrent sentences was unaffected by the convictions we have reversed.[19] *United States v. Pisani,* 787 F.2d 71, 75 n. 7 (2d Cir.1986); *United States v. Petrov,* 747 F.2d at 832; *United States v. Sperling,* 506 F.2d 1323, 1343 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975) and 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Hines,* 256 F.2d 561, 563–64 (2d Cir.1958). *Cf. United States v. Ruffin,* 575 F.2d 346, 361–62 (2d Cir.1978) (no remand for resentencing where unlikely district court would vary sentence); *United States v. Febre,* 425 F.2d 107, 113–14 (2d Cir.) (same), *cert. denied,* 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970).

19. We note that, in any event, the dispositions here would reduce Jones' term of imprisonment from ten to nine years, and Stephens' from seven to three and one-half years. In the latter connection, we deny Stephens' motion for bail pending appeal.

The large number of reversed convictions in this case persuades us of the possibility that those convictions could have affected the concurrent sentences.[20] *See United States v. Barash,* 365 F.2d 395, 403 (2d Cir.1966) (uncertain whether trial judge would have given same sentence for two unreversed convictions as he gave for original twenty-six convictions); *United States v. Petrov,* 747 F.2d at 832 (remanded for resentencing when five out of original eleven convictions reversed). Moreover, this is not a case where lenience of the original sentences might persuade us that reconsideration would not reduce those sentences. *See United States v. Ruffin,* 575 F.2d at 362 (where all but two months of original jail sentences for evasion of corporate income taxes were suspended, it was unlikely that resentencing would reduce sentence); *United States v. Moss,* 562 F.2d 155, 161 (2d Cir.1977) (sentence was "far more lenient" than the maximum that could have been imposed), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *United States v. Gaines,* 460 F.2d 176, 180 (2d Cir.) (appellant sentenced to four years in prison, considerably less than the fifteen year maximum), *cert. denied,* 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972); *United States v. Febre,* 425 F.2d at 113–14 (six-year sentence was only one year longer than the statutory minimum). Here, Blackmon and Jones both received the maximum five year prison sentence under 18 U.S.C. § 371 (1982), while Stephens received three and one-half years and Roland received eighteen months.[21] Blackmon was sentenced to the maximum three years for violation of 18 U.S.C. § 1028(a)(3) (1982 and Supp.IV 1986), while Jones was sentenced to one year less than the maximum. We do not believe that the concurrent sentence doctrine should apply under such circumstances.

### Conclusion

The judgments of conviction as to wire fraud conspiracy (count one) are affirmed as to all defendants, as are the convictions of Blackmon and Jones for possession of five or more identification devices with intent to use unlawfully (count thirty-two), of Blackmon for making a false statement in a financial affidavit (count thirty-three), and of Jones for contempt of court by violating a bail order (count thirty-four). All judgments of conviction for bank fraud (counts six to twenty) are reversed. The judgments of conviction for substantive wire fraud (counts three and four) are vacated as to all defendants, and the judgments of conviction of Blackmon and Jones for possession of fifteen or more access devices with intent to defraud (count thirty-one) are also vacated.

The case is remanded for resentencing, and for any other proceedings that may ensue, not inconsistent with this opinion.

---

**20.** For example, Blackmon's sentence on the valid conspiracy conviction is concurrent with sentences on one (reversed) count of bank fraud (five years) and one (vacated) count of possession of access devices (five years); his maximum three year sentence on the valid identification document count is concurrent with sentences on one (vacated) wire fraud count (five years) and thirteen (reversed) bank fraud counts (five years each); and his two year sentence on the valid false statement conviction is concurrent with sentences on one (vacated) wire fraud count (five years) and thirteen (reversed) bank fraud counts (five years each). In all, convictions on eighteen counts are reversed, while three are affirmed.

**21.** It should be remembered that neither Stephens nor Roland was indicted on the access device, identification document, false statement or contempt counts. Each was, however, convicted on two counts of wire fraud and eleven (Roland) or twelve (Stephens) counts of bank fraud, which convictions we have vacated or reversed.